Vol:   2                    04-70036

                DEATH PENALTY CASE

RECORD ON APPEAL


Murphy
   v.
Dretke


        Property of              U.S. COURT OF APPEALS
U.S. COURT OF APPEALS                   FILED
    Fifth Circuit                      9/23/04
                            CHARLES R. FULBRUGE III
                                       Clerk



04-70036R1T1

1                    UNITED STATES DISTRICT COURT

2                  EASTERN DISTRICT OF TEXAS

3                    TEXARKANA DIVISION

4    JULIUS JEROME MURPHY          .   DOCKET NO. 5:02CV86

5    VS.                           .   TEXARKANA, TEXAS

6    TEXAS DEPARTMENT OF CRIMINAL   .   JUNE 21, 2004

7    JUSTICE                       .   1:43 P.M..

8

9                    EVIDENTIARY HEARING

10        BEFORE THE HONORABLE CAROLINE M. CRAVEN,

11             UNITED STATES MAGISTRATE JUDGE.

12   APPEARANCES:

13   FOR PETITIONER:              MR. KEVIN SCOTT DUNN

14                                ATTORNEY AT LAW

15                                594 SAWDUST ROAD

16                                PMB #332

17                                THE WOODLANDS, TEXAS 77380

18   FOR RESPONDENT:              MS. DENI GARCIA

19                                ATTORNEY GENERAL'S OFFICE

20                                P. O. BOX 12548

21                                CAPITOL STATION

22                                AUSTIN, TEXAS 78711-2548

23   COURT REPORTER:             MRS. LIBBY CRAWFORD

24                                OFFICIAL COURT REPORTER

25                                500 STATE LINE AVENUE

1                                    TEXARKANA,  TEXAS  75501

2                                    903/794-4067  (EXT.  237)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   PROCEEDINGS  RECORDED  BY  MANUAL  STENOGRAPHY,  TRANSCRIPT

25   PRODUCED  BY  NOTE  READING.

1                          P R O C E E D I N G S

2                            TEXARKANA, TEXAS

3                             JUNE 21, 2004

4           (OPEN COURT; ALL PARTIES PRESENT)

5                THE COURT: PLEASE BE SEATED.   SORRY FOR THE SLIGHT

6    DELAY.   I WAS VISITING WITH THE ATTORNEYS IN THE MATTER,

7    HOPEFULLY, IN ORDER THAT WE COULD STREAMLINE THE HEARING THIS

8    AFTERNOON.

9           ALL RIGHT, I AM GOING TO CALL THE CASE THAT IS SCHEDULED

10   FOR HEARING.   IT IS MURPHY V. DRETKE, CAUSE NUMBER 5:02CV86.

11   WHAT WE HAVE SCHEDULED THIS AFTERNOON IS AN EVIDENTIARY

12   HEARING ON A FACT ISSUE REGARDING THE PROSECUTION'S USE OF

13   PEREMPTORY CHALLENGES AT THE TRIAL, AND I JUST WANTED TO GET

14   THAT CLEAR FOR THE RECORD.   IT IS A VERY NARROW ISSUE, SO I

15   WOULD ASK THAT THE ATTORNEYS KEEP THAT IN MIND WHEN EXAMINING

16   THE WITNESSES OR MAKING ANY ARGUMENT.

17          ALL RIGHT, WOULD THE PARTIES MAKE ANNOUNCEMENTS FOR THE

18   RECORD?

19               MR. DUNN: FOR THE PETITIONER, YOUR HONOR, JULIUS

20   MURPHY, MY NAME IS KEVIN DUNN, D-U-N-N.

21               THE COURT: ALL RIGHT.

22               MS. GARCIA: AND FOR THE RESPONDENT, I AM DENI

23   GARCIA, D-E-N-I, GARCIA, G-A-R-C-I-A.

24               THE COURT: THANK YOU.   OKAY.   MS. GARCIA, I KNOW WE

25   TALKED IN CHAMBERS ABOUT YOUR GOING AHEAD AND CALLING MR.

1   SMITH AS A WITNESS, AND I KNOW YOU HAD SOME ISSUE WITH GOING

2   FORWARD IN THAT MANNER; AND IF YOU WANTED TO STATE YOUR

3   OBJECTION ON THE RECORD AT THIS TIME, GO RIGHT AHEAD.

4           MS. GARCIA: YES, YOUR HONOR, THANK YOU.  IT IS

5   DIRECTOR DRETKE'S POSITION THAT IN A BATSON CHALLENGE THE

6   BURDEN OF PROOF ALWAYS STAYS WITH THE DEFENDANT/PETITIONER AND

7   NEVER SHIFTS TO THE RESPONDENT.  AND IN A FEDERAL COURT

8   HEARING, ON A FEDERAL HABEAS HEARING, THE SAME HOLDS TRUE,

9   THAT THE DEFENDANT [SIC] RESTS WITH THE PETITIONER AT ALL

10  TIMES.  AND SO IT IS OUR POSITION THAT WE DON'T ASSUME ANY

11  BURDEN IN THIS HEARING, AND THAT WE WOULD EXPECT THE

12  PETITIONER TO CALL THE DISTRICT ATTORNEY IN THIS CASE.

13          THE COURT: OKAY.  ALL RIGHT.

14          MR. DUNN: OKAY, YOUR HONOR, FOR THE RECORD, IT IS

15  OUR POSITION THAT AT THIS TIME THE BURDEN DOES LIE WITH THE

16  STATE.  BASICALLY, THIS IS A DISPARATE QUESTIONING ISSUE.  IT

17  HAS BROUGHT TO THE COURT'S ATTENTION THAT THERE WAS DISPARATE

18  QUESTIONING IN THIS CASE.  AND IT IS OUR UNDERSTANDING THAT

19  THE BURDEN SHOULD SHIFT TO THE STATE, AND WE ALSO THINK THE

20  RECENT MILLER L. SUPREME COURT CASE DICTATES THAT ALSO.

21          THE COURT: OKAY.  AS INDICATED TO COUNSEL IN

22  CHAMBERS, THE COURT IS GOING TO GO AHEAD AND OVERRULE THE

23  OBJECTION OF MS. GARCIA AND ASK THAT SHE CALL HER FIRST

24  WITNESS FOR THE REASON THAT THIS IS A VERY NARROW ISSUE.  THE

25  COURT SCHEDULED THIS HEARING FOR JUST THE PURPOSE OF GATHERING

1   INFORMATION WITH REGARD TO MR. SMITH'S THOUGHT PROCESSES, AND

2   THE REASONS GIVEN AND THAT SORT OF THING, DURING THE JURY

3   SELECTION AT THE ORIGINAL TRIAL.  SO WITH THAT BEING SAID, IF

4   YOU WILL PROCEED.

5              MS. GARCIA: YES.  WE WOULD LIKE TO CALL ALWIN SMITH.

6              THE COURT: ALL RIGHT.  IF YOU WOULD STEP FORWARD AND

7   SHE WILL ADMINISTER THE OATH.

8         (WITNESS SWORN)

9              THE COURT: GO AHEAD.

10             MS. GARCIA: MAY IT PLEASE THE COURT.

11            ALWIN SMITH, RESPONDENT'S WITNESS, SWORN

12                     DIRECT EXAMINATION

13  BY MS. GARCIA:

14  Q    COULD YOU PLEASE STATE YOUR NAME FOR THE RECORD?

15  A    MY NAME IS ALWIN A. SMITH.

16  Q    AND HOW ARE YOU EMPLOYED?

17  A    I AM THE TRIAL CHIEF FOR THE BOWIE COUNTY CRIMINAL

18  DISTRICT ATTORNEY'S OFFICE.

19  Q    AND HOW LONG HAVE YOU BEEN IN THAT POSITION?

20  A    SINCE 1995.

21  Q    AND IN WHAT CAPACITY DO YOU SERVE THERE?

22  A    I PROSECUTE CASES IN THE 102ND JUDICIAL DISTRICT COURT.  I

23  ALSO HELP ASSIST THE OTHER ATTORNEYS IN OUR OFFICE WITH THEIR

24  TRIAL SCHEDULES PREPARATION.  UP UNTIL LAST YEAR, I WAS THE

25  FELONY INTAKE ATTORNEY PREPARING CASES FOR GRAND JURY, AND IN

1   MY SPARE TIME I ALSO DO THE DHS DOCKET.

2   Q    OKAY.  AND YOU HAVE HAD OCCASION TO TRY CAPITAL MURDER

3   TRIALS?

4   A    YES.

5   Q    OKAY.  AND APPROXIMATELY HOW MANY WOULD YOU SAY?

6   A    SEVEN, IF I AM NOT MISTAKEN.

7   Q    AND THAT INVOLVES SELECTING A JURY?

8   A    YES.

9   Q    IN THIS CASE, YOU ARE FAMILIAR WITH THIS CASE.  YOU TRIED

10  THE JEROME JULIUS MURPHY CASE?

11  A    YES, I DID.  I WAS THE LEAD ATTORNEY.

12  Q    AND DID YOU HANDLE THE VOIR DIRE IN THAT CASE?

13  A    ALONG WITH MS. WRIGHT, YES.

14  Q    I WANT TO ASK YOU ABOUT THE JUROR QUESTIONNAIRES AND

15  ESSENTIALLY YOUR APPROACH TO VOIR DIRE, HOW YOU APPROACH A

16  VOIR DIRE SITUATION.  FIRST OF ALL, YOU ARE FAMILIAR WITH THE

17  JUROR QUESTIONNAIRE FORM?

18  A    YES.

19  Q    AND THE QUESTIONS ON IT?

20  A    YES, MA'AM.

21  Q    AND ARE YOU FAMILIAR WITH THE QUESTION THAT ASKS IF

22  SOMEBODY HAS BEEN CONVICTED OR CHARGED WITH A CRIME?

23  A    I THINK THERE ARE ACTUALLY TWO QUESTIONS.  I THINK THERE

24  WAS ONE QUESTION THAT ASKED SPECIALLY ABOUT ANY CRIMINAL

25  CONVICTION, OTHER THAN A TRAFFIC OFFENSE, AND I THINK THERE IS

1    ALSO A SEPARATE QUESTION ON THE QUESTIONNAIRE WE USED IN THIS

2    CASE THAT ASKED ABOUT ARRESTS.

3    Q    OKAY.   CAN YOU KIND OF TELL ME THE DIFFERENCE BETWEEN A

4    CHARGE AND AN ARREST AND A CONVICTION, AND NOT SO MUCH IN THE

5    LEGAL SENSE, BUT IN THE VOIR DIRE CONTEXT AND THE MEANING OF

6    HOW YOU WOULD APPROACH THOSE?

7    A    WELL, IN THE VOIR DIRE CONTEXT OF ANSWERING THOSE TWO

8    QUESTIONS, THE REASON WHY THEY ARE IMPORTANT IS THAT PEOPLE

9    OCCASIONALLY FIND THEMSELVES WRAPPED UP IN THE CRIMINAL

10   JUSTICE SYSTEM AND THEY EITHER GET CHARGED OR ARRESTED FOR AN

11   OFFENSE THAT THEY ARE NOT CONVICTED OF.   THAT, OF COURSE, IS

12   DIFFERENT THAN SOMEBODY WHO HAS BEEN CONVICTED IN A COURT OF

13   LAW OF A CRIMINAL OFFENSE, EITHER BY PLEADING GUILTY OR BEING

14   FOUND GUILTY BY A JURY.

15        THE REASON THAT THAT IS IMPORTANT IS, IS THAT IT MAY GIVE

16   YOU AN INDICATION OF HOW SOMEBODY WAS YOUNGER IN THEIR LIFE OR

17   IF THEY HAVE A PATTERN OF CRIMINAL BEHAVIOR.

18   Q    ARE YOU FAMILIAR WITH THE TERM ASC?

19   A    I HAVE HAD SOME INFORMATION COME TO ME RECENTLY THAT I

20   THINK MAY TELL ME WHAT ASC IS.   WHEN WE TRIED THIS CASE, I

21   DON'T BELIEVE ANYBODY HAD A CLUE WHAT ASC MEANT.

22   Q    WOULD YOU CONSIDER A FORGERY THEFT MORE SERIOUS THAN AN

23   ASC, WHATEVER IT IS?

24   A    YES, AND IF I CAN JUST KIND OF EXPLAIN.   BACK DURING THE

25   VOIR DIRE PROCESS WHEN WE GOT THE INFORMATION, I THINK IT WAS

1   MS. SMITH THAT HAD THE ASC NOTATION THAT WAS BACK IN LIKE

2   1974, WHICH WAS ABOUT TWENTY, I THINK TWENTY-THREE, TWENTY-

3   FOUR YEARS BEFORE WE ACTUALLY TRIED THIS CASE.  WE COULD NOT

4   FIND ANYBODY THAT COULD TELL US WHAT ASC MEANT.  IT IS MY

5   RECOLLECTION THAT MS. WRIGHT, WHO WAS ASSISTING ME IN THAT

6   TRIAL, HAD GOTTEN SOME INFORMATION THAT WE THOUGHT IT WAS A

7   PROPERTY CRIME KIND OF THING, MAYBE LIKE A HOT CHECK CASE, OR

8   I THINK SHE ACTUALLY GOT SOME INFORMATION LATER THAT SUGGESTED

9   TO HER THAT IT WAS POSSIBLY HINDERING A SECURED CREDITOR

10  CHARGE.

11      WHEN WE DID THE RESEARCH ON THAT THROUGH OUR LOCAL

12  SYSTEM, WE WEREN'T ABLE TO FIND ANY DOCUMENTATION TO TELL US

13  ONE WAY OR ANOTHER ON THAT ASC CHARGE.  OF COURSE, A FORGERY

14  IS A FELONY OFFENSE, WHICH WOULD BE MUCH MORE SERIOUS THAN A

15  HOT CHECK CHARGE.

16  Q    WHAT IS THE IMPLICATION OF A FORGERY OFFENSE OR

17  CONVICTION?

18  A    WELL, AN IMPLICATION, THE MOST SERIOUS IMPLICATION FOR

19  OUR PURPOSES IN VOIR DIRE, AND WHETHER IT'S A CAPITAL CASE OR

20  ANY OTHER KIND OF A TRIAL, WOULD BE A FORGERY CERTAINLY

21  REQUIRES A CRIMINAL MENTAL STATE.  IN OTHER WORDS, SOMEBODY

22  HAS TO INTENTIONALLY DO SOMETHING OF A CRIMINAL NATURE TO

23  EITHER WRITE OUT A FORGED CHECK, OR TO STEAL THE CHECK TO GET

24  IT FORGED, OR TO PASS A CHECK THAT THEY KNOW HAS BEEN FORGED.

25  SO THAT'S WHY IT IS IMPORTANT FOR OUR PURPOSES.

1   Q      WOULD A CONVICTION FOR FORGERY DISQUALIFY A JUROR

2   AUTOMATICALLY?

3   A      A FELONY CONVICTION IN TEXAS WOULD DISQUALIFY A JUROR.

4   Q      SO THAT WOULD BE IMPORTANT TO KNOW UP FRONT?

5   A      IT WOULD HAVE BEEN VERY MUCH IMPORTANT, ESPECIALLY BACK

6   IN 1998, BECAUSE AT THAT TIME, IF MY RECOLLECTION SERVES ME

7   CORRECTLY, THE STATUS OF THE LAW WAS, IS THAT IF A JUROR WITH

8   A FELONY CRIMINAL CONVICTION, IN OTHER WORDS, A DISQUALIFIED

9   JUROR WERE PLACED ON A JURY, IT DID NOT MATTER WHOSE FAULT IT

10  WAS, IT WAS GOING TO BE ERROR.

11  Q      OKAY.  CAN YOU GIVE US AN IDEA OF WHAT IS YOUR GENERAL

12  VOIR DIRE STRATEGY GOING INTO A CASE?

13  A      IN A CAPITAL MURDER CASE, AND I GUESS I JUST NEED TO ASK

14  YOU.  ARE YOU TALKING ABOUT MY GENERAL PHILOSOPHY OR HOW I

15  APPROACH IT?

16  Q      HOW YOU APPROACH IT MAINLY, BUT -- OR YOUR PHILOSOPHY.

17  A      WELL, OF COURSE, MY PHILOSOPHY IS, IS THAT WE ARE LOOKING

18  FOR A JUROR WHO BELIEVES UNDER THE APPROPRIATE SET OF

19  CIRCUMSTANCES, BASED ON THE FACTS OF THE CASE, THAT THEY CAN

20  ANSWER THE SPECIAL ISSUES AT PUNISHMENT IN SUCH A WAY THAT THE

21  DEATH PENALTY WOULD BE IMPOSED.

22          AS FAR AS HOW WE APPROACH IT, MY PERSONAL METHOD OF

23  APPROACHING CAPITAL VOIR DIRE IS, IS I USUALLY MAKE UP AN

24  OUTLINE OF WHAT YOU CONSIDER TO BE THE HOT ISSUES OR HOT

25  TOPICS, IF YOU WILL, FOR THAT PARTICULAR CASE, AND TALK TO THE

1  JURORS WITH REGARD TO THOSE ISSUES AFTER TALKING TO THEM ABOUT

2  ANSWERS THAT THEY HAVE GIVEN ON THE QUESTIONNAIRE.  I USUALLY

3  START WITH THE QUESTIONNAIRE AND THE ANSWERS THAT THE JUROR

4  HAS GIVEN IN THE QUESTIONNAIRE, AND THEN MOVE ON TO THOSE

5  OTHER ISSUES.

6  Q     DO YOU FOLLOW A SET SCRIPT WHEN YOU APPROACH THE

7  QUESTIONNAIRE?

8  A     NO, MA'AM, ABSOLUTELY NOT.  I CAN'T AFFORD TO.  IN ALL

9  THE CAPITAL MURDER CASES WHEN YOU GET DOWN TO THE INDIVIDUAL

10 VOIR DIRE, THE TRIAL COURT WILL ALWAYS SET A LIMIT ON THE

11 AMOUNT OF TIME IT IS GOING TO LET YOU TALK TO THE JURORS.  THE

12 DEFENSE HAS A LITTLE BIT BETTER TIME IN THAT AREA IN THAT THEY

13 CAN USUALLY CONVINCE THE JUDGE TO GIVE THEM EXTRA TIME.  I

14 USUALLY DON'T HAVE THAT LUXURY.  SO I HAVE TO PRETTY MUCH HONE

15 DOWN MY QUESTIONING TO WHAT I CONSIDER TO BE THE MOST

16 IMPORTANT THINGS TO ASK THAT PARTICULAR JUROR, AND GET TO IT.

17 Q     AND WHAT YOU ASK THAT PARTICULAR JUROR, IS THAT DEPENDENT

18 ON THEIR RESPONSES TO THE QUESTIONNAIRE?

19 A     IN LARGE PART, YES, MA'AM.

20 Q     IN THIS CASE WHAT WOULD YOU CONSIDER SOME OF THE MAJOR

21 ISSUES GOING IN TO THE VOIR DIRE?

22 A     I AM HAVING TO THINK BACK ON THIS PARTICULAR CASE.  AGE

23 OF THE DEFENDANT WAS ONE.  THE FACTS IN THIS CASE WERE

24 PARTICULARLY BAD, AND SO IT WAS IMPORTANT TO TALK TO JURORS IN

25 A WAY ABOUT THE FACTS OF THE CASE, OR SUGGESTING THE SCENARIO

1   THAT WOULD NOT AUTOMATICALLY GET A RESPONSE OF: IF YOU PROVE

2   THAT TO ME, I AM NOT GOING TO CONSIDER ANYTHING ELSE BUT THE

3   DEATH PENALTY.  SO THAT WAS A CONSIDERATION IN THIS CASE.

4         THE FACT THAT THERE WERE GOING TO BE TESTIFYING EITHER

5   ACCOMPLISHES OR CO-DEFENDANTS WAS ANOTHER ISSUE THAT HAD TO BE

6   TAKEN UP IN THIS CASE, BECAUSE WE HAD FOUR PEOPLE THAT WERE

7   ACTUALLY IN THE CAR WITH THE TWO CHARGED DEFENDANTS AT THE

8   TIME OF THE MURDER.

9   Q     OKAY.  IS IT COMMON TO RUN A CRIMINAL HISTORY ON

10  PROSPECTIVE JURORS?

11  A     CRIMINAL HISTORY KIND OF HAS TWO, YOU KNOW, TWO

12  DEFINITIONS.  A STATEWIDE, FEDERAL CRIMINAL HISTORY, NO, WE

13  DID NOT DO THAT.  HOWEVER, WE HAD -- HAVE THE LUXURY IN OUR

14  COUNTY OF HAVING A LOCAL SYSTEM THAT CAN TRACK LOCAL ARRESTS,

15  AND WE DID DO -- WE DID DO THAT KIND OF CHECK ON OUR POTENTIAL

16  JURORS TO SEE IF THEY HAD BEEN HANDLED LOCALLY BY ANYBODY.

17  Q     DO YOU RECALL IN THIS CASE WHETHER THE DEFENSE REQUESTED

18  A CRIMINAL HISTORY ON THE PROSPECTIVE JURORS?

19  A     YES.  IN EVERY CASE THAT I'VE -- EVERY CAPITAL CASE I'VE

20  TRIED, THE DEFENSE ALWAYS ASKS THAT IF WE GET THAT INFORMATION

21  THAT WE SHARE IT WITH THE DEFENSE.

22  Q     AND YOU PROVIDED THAT TO THE DEFENSE IN THIS CASE?

23  A     YES, MA'AM.

24  Q     DO YOU RECALL APPROXIMATELY HOW MANY POTENTIAL JURORS HAD

25  CRIMINAL BACKGROUNDS?

1   A      SEEMS LIKE THERE WERE BETWEEN ABOUT SIX AND EIGHT, IF I

2   AM CLOSE.   I REMEMBER WE TURNED OVER A SHEET THAT MS. WRIGHT

3   PREPARED THAT GAVE THE DEFENDANT'S NAME -- I'M SORRY, THE

4   PROSPECTIVE JUROR'S NAME, ALONG WITH THE CHARGE, USUALLY THE

5   DATE OF EITHER THE ARREST OR THE CHARGE, AND THEN IF WE HAD A

6   CAUSE NUMBER TO SHOW THAT THEY HAD ACTUALLY GONE TO COURT,

7   ANYTHING LIKE THAT, WE WOULD ALSO PROVIDE THAT TO THEM.

8   Q      IS THE SERIOUSNESS OF THE OFFENSE RELEVANT TO YOU FOR

9   VOIR DIRE PURPOSES?

10  A      ABSOLUTELY.

11  Q      CAN YOU GIVE AN EXAMPLE OF DIFFERENT TYPES OF OFFENSES?

12  A      WELL, SOMEBODY WHO, FOR INSTANCE, AT A VERY YOUNG AGE MAY

13  HAVE GOTTEN LIKE A PUBLIC INTOXICATION CHARGE, AND THERE HAVE

14  BEEN A NUMBER OF YEARS THAT HAVE GONE BY AND THAT WAS THE ONLY

15  CHARGE THEY HAD EVER HAD, THAT, OF COURSE, IS NOT GOING TO BE

16  IMPORTANT FOR OUR PURPOSES ABSENT ANYTHING ELSE, AS OPPOSED

17  TO, YOU KNOW, A FELONY CHARGE.

18  Q      DO YOU RECALL IN THIS CASE WHETHER YOU PROVIDED A LIST OF

19  ACTUAL ARRESTS, ACTUAL CONVICTIONS, OR CHARGES?  WHAT WAS THE

20  LIST?  WAS IT CONVICTIONS OR ARRESTS?

21  A      I THINK IT INCLUDED EVERYTHING WE KNEW ABOUT AN

22  INDIVIDUAL JUROR.   IN OTHER WORDS, IF WE ONLY HAD A CHARGE AND

23  A DATE THAT THE PERSON WAS CHARGED WITH THAT OFFENSE, THEN

24  THAT'S ALL WE PROVIDED.   IF WE HAD INFORMATION THAT INCLUDED A

25  CAUSE NUMBER WHERE THEY HAD ACTUALLY BEEN CONVICTED, WE

1   INCLUDED THAT INFORMATION.  EVERYTHING WE KNEW WE PROVIDED TO

2   THE DEFENSE COUNSEL.

3   Q    OKAY.  IS THE DATE OF THE OFFENSE RELEVANT TO YOU FOR

4   VOIR DIRE PURPOSES?

5   A    YES.  LIKE I SAID, SOMEBODY THAT, FOR INSTANCE, IN THEIR

6   FORTIES WHO IS A POTENTIAL JUROR ARRESTED BACK WHEN THEY WERE

7   EIGHTEEN FOR PUBLIC INTOXICATION, OR MAYBE A MINOR DWI, OR HOT

8   CHECK CASE, SOMETHING LIKE THAT, IS NOT GOING TO BE IMPORTANT

9   VIS-A-VIE SOMEBODY, YOU KNOW, FOR INSTANCE, THAT HAD BEEN

10  CHARGED WITH A FELONY OFFENSE, NOT, YOU KNOW, THAT DISTANT IN

11  THE PAST.

12  Q    SO DO YOU MAKE A CONSCIOUS DETERMINATION TO ASK EVERY

13  PROSPECTIVE JUROR ABOUT THEIR CRIMINAL BACKGROUND, REGARDLESS

14  OF THE OFFENSE AND THE DATE OF THE OFFENSE?

15  A    YEAH, IF I UNDERSTAND YOUR QUESTION, DO WE MAKE A

16  DECISION ON SOME DO WE ASK AND SOME DO WE NOT ASK, YES, MA'AM.

17  YES, WE DO.

18  Q    AND THAT YOU DO OR YOU DON'T ASK EVERY JUROR?

19  A    WE DON'T NECESSARILY ASK EVERY JUROR ABOUT THEIR

20  POTENTIAL CRIMINAL BACKGROUND.  AND IT JUST DEPENDS ON THE

21  FACTS AND WHAT THE PERSON SAYS IN THE QUESTIONNAIRE.  IF, FOR

22  INSTANCE, SOMEBODY HAD HAD SOME MINOR SCRAPE WITH THE LAW OR

23  SOME MINOR OFFENSE A LONG TIME AGO, AND THEY NOTICED THAT ON

24  THEIR QUESTIONNAIRE, THEN IT MAY NOT BE NECESSARY TO TALK TO

25  THEM ABOUT IT, IF WE DECIDE THAT IT'S DIMINIMUS.

1    HOWEVER, SOMEBODY WHO HAS A CRIMINAL BACKGROUND OR HAD

2   CHARGES IN THE PAST WHO LIES ABOUT IT, OR NOT NECESSARILY

3   LIES, BUT OMITS IT FROM THEIR QUESTIONNAIRE, THEN THAT MIGHT

4   BE SOMETHING WE WANT TO TALK ABOUT.

5   Q    DO YOU EVER ASK A PROSPECTIVE JUROR ABOUT THEIR CRIMINAL

6   BACKGROUND SOLELY BECAUSE OF THEIR RACE?

7   A    NO, MA'AM.

8   Q    IS IT COMMON FOR PROSPECTIVE JURORS TO OMIT A CRIMINAL

9   HISTORY ON THEIR JUROR QUESTIONNAIRE?

10  A    IT HAPPENS QUITE FREQUENTLY WHERE JURORS WILL OMIT, I

11  CALL IT -- I CALL IT IGNORE SOMETHING IN THEIR PAST, MAYBE IT

12  WAS A LONG TIME AGO, THEY REALLY DON'T WANT TO TALK ABOUT IT.

13  THEY MAY JUST OMIT TO PUT IT DOWN.

14  Q    DO THEY FORGET?

15  A    SOMETIMES THEY ACTUALLY DO.  WE HAVE INSTANCES, WHERE

16  ESPECIALLY WITH FOLKS WHO HAVE HAD HOT CHECKS IN OUR OFFICE OR

17  BEEN COLLECTED BY A JP, WHEN YOU ASK SOMEBODY LIKE THAT HAVE

18  YOU EVER BEEN CONVICTED OF A CRIME, THEY, A LOT OF TIMES,

19  DON'T REALLY THINK THAT THEY HAVE BEEN CONVICTED OF A CRIME.

20  THEY THINK OF IT AS LIKE PAYING A TRAFFIC TICKET, AND THAT'S

21  ONE OF THE NOTATIONS ON THE QUESTIONNAIRE.  IT TALKS ABOUT

22  ANYTHING OTHER THAN A MINOR TRAFFIC OFFENSE.  AND WE HAVE A

23  LOT OF SITUATIONS WHERE WE HAVE JURORS WHO HAVE HAD MINOR, YOU

24  KNOW, HOT CHECK CHARGES, THAT KIND OF THING, WHO WON'T PUT IT

25  DOWN ON THEIR QUESTIONNAIRE BECAUSE THEY DON'T THINK IT'S A

1   CRIME.  YOU KNOW, THEY THINK, WELL, I PAID MY HOT CHECK, OR I

2   PAID A $100 FINE AND I WENT ON ABOUT MY WAY, AND THEY JUST

3   DON'T THINK OF IT, YOU KNOW, THE WAY WE DO.

4   Q    DO YOU THINK IT'S LIKELY THAT SOMEBODY WOULD CONFUSE A

5   FORGERY CHARGE AND A THEFT CONVICTION OF NOT BEING A CRIME?

6   A    I CAN'T SEE HOW THEY WOULD.

7   Q    IS IT RELEVANT WHEN YOU GO THROUGH VOIR DIRE AND YOU ASK

8   JURORS QUESTIONS, IS IT RELEVANT WHERE THEY ARE SITUATED IN

9   THE JURY POOL, MEANING EARLY ON IN THE VOIR DIRE, TOWARDS THE

10  MIDDLE, OR TOWARDS THE END?

11  A    CERTAINLY, IT DOES.  IN THIS PARTICULAR CASE, AND EVEN

12  WITH JUDGE MILLER, WE HAVE DONE THIS ALMOST EVERY CONCEIVABLE

13  WAY TO DO IT AS FAR AS PICKING A JURY.  THIS PARTICULAR CASE,

14  THE METHOD THAT JUDGE MILLER WAS, IS THAT WE WERE ACTUALLY

15  DOING THE INDIVIDUAL VOIR DIRE.  THE JURORS THAT WERE

16  QUALIFIED AT THE END OF THE INDIVIDUAL VOIR DIRE WERE PLACED

17  IN A POOL.  AND IT WASN'T UNTIL I THINK WE PICKED 46,

18  SOMETHING LIKE THAT, 45, 46 PERSONS TO BE IN THE POOL THAT THE

19  JUDGE THEN STOPPED US AND WE WENT BACK AND THEN BEGAN OUR

20  STRIKING OF THE LIST TO DETERMINE WHO WAS ACTUALLY GOING TO BE

21  ON THE JURY.

22      NOW OTHER WAYS THAT WE HAVE DONE IT, AND THE WAY THAT THE

23  COURTS ARE KIND OF DOING IT MOST OF THE TIME NOW, IS THAT AT

24  INDIVIDUAL VOIR DIRE, AT THE CONCLUSION OF THAT PERSON'S

25  INDIVIDUAL VOIR DIRE, THEN THE STATE AND THE DEFENDANT HAVE TO

1   ELECT WHETHER TO PASS ON THAT PERSON OR ACCEPT THEM.

2   Q       BUT IN THIS CASE YOU ACTUALLY INTERVIEWED, INDIVIDUALLY

3   VOIR DIRED ALL 46 JURORS?

4   A       EVERYBODY THAT WAS IN THE PANEL, YES.   AND BY THE PANEL I

5   MEAN THE PANEL THAT WAS SELECTED AS A QUALIFIED PANEL BEFORE

6   JUDGE MILLER CUT US OFF AND SAID WE HAD ENOUGH, BECAUSE BY

7   MATHEMATICS, IF BOTH SIDES GET FIFTEEN STRIKES APIECE, THAT'S

8   THIRTY JURORS, THEN IF YOU ADD TWELVE MORE TO THAT, THEN

9   THAT'S THIRTY-TWO JURORS, I'M SORRY, FORTY-TWO JURORS.   AND

10  ANYTHING PAST FORTY-TWO IS THEN JUST A BUFFER IN CASE YOU HAVE

11  A JUROR IN THAT PANEL WHO LATER COMES BACK AND SAYS, YOU KNOW,

12  I HAVE THOUGHT ABOUT IT AND I JUST CAN'T DO THIS.

13  Q       SO YOUR VOIR DIRE OF SOMEBODY WHO WAS TOWARDS THE END OF

14  THAT LIST IN COMPARISON TO SOMEBODY WHO WAS MORE TOWARDS THE

15  MIDDLE OF THAT LIST WOULD BE A LITTLE BIT DIFFERENT?

16  A       YES, MA'AM, BECAUSE YOU UNDERSTAND THE TRIAL STRATEGY,

17  THE MORE AND MORE -- AS VOIR DIRE GOES ON, AND IT'S A CAPITAL

18  MURDER VOIR DIRE IS KIND OF A FLUID BATTLE SITUATION, IF YOU

19  WILL.   THE FIRST MANY JURORS, EVERYBODY THAT, AND BY EVERYBODY

20  I MEAN THE DEFENSE AND THE PROSECUTORS ARE KIND OF TRYING TO

21  FEEL EACH OTHER OUT, FIGURE OUT WHAT ARE THE ISSUES THEY ARE

22  GOING TO TALK ABOUT, WHAT ARE THE ISSUES WE ARE GOING TO TALK

23  ABOUT.

24          THE NEXT MANY JURORS ARE USUALLY WHAT I CALL THE

25  BATTLEGROUND JURORS, AND THOSE ARE USUALLY WHERE YOU GET A LOT

1   OF YOUR OBJECTIONS TO PARTICULAR QUESTIONS BEING ASKED, THOSE

2   KINDS OF THINGS.  BUT THEN AS YOU GO ALONG, ESPECIALLY IN A

3   PANEL SITUATION, EVERYBODY IS USING THEIR BEST STRATEGY

4   FIGURING OUT WHO THAT SIDE WANTS, WHO WE WANT.  YOU PRETTY

5   MUCH HAVE KIND OF GOT AN IDEA OF WHEN YOU ARE GOING TO RUN OUT

6   OF STRIKES, WHEN THEY ARE POSSIBLY GOING TO RUN OUT OF

7   STRIKES, AND AT SOME POINT IT KIND OF BECOMES, I DON'T WANT TO

8   SAY ROTE, BUT IT BECOMES MORE A PROCESS OF KIND OF GET THROUGH

9   IT, SO TO SPEAK, AND GET IT OVER WITH BECAUSE YOU KNOW, OR YOU

10  HAVE A PRETTY GOOD IDEA WHERE THE JURY IS GOING TO SHAKE OUT.

11  Q    IN THIS CASE, DO YOU REMEMBER A PROSPECTIVE JUROR

12  CELLERS?

13  A    I REMEMBER MS. CELLERS, YES.

14  Q    AND WHAT DO YOU REMEMBER ABOUT HER?

15  A    I REMEMBER THAT MS. CELLERS INDICATED THAT SHE HAD NEVER

16  BEEN ARRESTED OR CHARGED BEFORE, WHEN, IN FACT, SHE HAD BEEN

17  CONVICTED OF THEFT BY JUDGE JONES, GUY JONES, WHO WAS A FORMER

18  DISTRICT JUDGE HERE.  SHE ALSO SAID THAT SHE HAD NEVER BEEN

19  ARRESTED BEFORE, AND SHE HAD ACTUALLY BEEN ARRESTED BY THE

20  TEXARKANA, TEXAS POLICE DEPARTMENT FOR FORGERY.  SHE HAD ALSO

21  HAD A SHOPLIFTING CHARGE, IF I AM NOT MISTAKEN.

22  Q    AND YOU KNEW THAT GOING INTO THE VOIR DIRE.  BEFORE YOU

23  EVEN BEGAN QUESTIONING HER, YOU KNEW THAT SHE HAD ESSENTIALLY

24  LIED ABOUT HER CONVICTION?

25  A    YES, MA'AM.  WE HAD THE INFORMATION, IN THAT WE HAD HER

1    QUESTIONNAIRE AND WHAT HER RESPONSES WERE IN THE

2    QUESTIONNAIRE, AND WE ALSO HAD THE PRINTOUT FROM THE LOCAL

3    SYSTEM THAT TOLD US ABOUT HER PREVIOUS ARRESTS.

4    Q      THEN DID YOU ASK HER ABOUT THOSE OFFENSES DURING HER VOIR

5    DIRE?

6    A      YES, MA'AM.

7    Q      IS THERE ANY PARTICULAR REASON WHERE OR WHEN OR HOW THAT

8    SUBJECT CAME UP?

9    A      WELL, FOR HER SPECIFIC CASE, THE REASON -- IT CAME UP

10   VERY QUICKLY, AND THE REASON WAS IS BECAUSE THERE WAS AN

11   INDICATION THAT SHE HAD BEEN CONVICTED OF THEFT, WHICH WOULD

12   HAVE MADE HER INELIGIBLE TO SERVE ON THE JURY, THAT SHE HAD

13   ALSO BEEN ARRESTED, AND WE COULD NOT FIND THE DISPOSITION, BUT

14   THAT SHE HAD BEEN ARRESTED FOR FORGERY, WHICH HAD SHE BEEN

15   CONVICTED WOULD HAVE DISQUALIFIED HER FOR THE JURY.

16   Q      SO ESSENTIALLY YOU JUST CUT TO THE CHASE WITH THAT JUROR?

17   A      YES, MA'AM.  I MEAN, IF SHE IS DISQUALIFIED BY LAW TO BE

18   SITTING ON THE JURY, THEN THERE IS NOT ANY REASON TO ASK HER

19   ANY QUESTIONS AS FAR AS WHAT SHE THINKS ABOUT THE DEATH

20   PENALTY OR ANY OF THOSE THINGS, BECAUSE IT'S JUST REALLY JUST

21   A WASTE OF TIME.

22            THE COURT: WOULD YOU ALL HAVE HAD TO EXERCISE -- YOU

23   WOULDN'T HAVE TO WASTE A PEREMPTORY CHALLENGE ON HER, THOUGH?

24   WOULDN'T SHE BE EXCUSED FOR CAUSE?  WOULDN'T THE JUDGE JUST

25   SAY: I AM NOT GOING TO QUALIFY HER?

1          THE WITNESS: YES, MA'AM, THAT'S CORRECT.   IF SHE HAD

2    BEEN CONVICTED OF THE THEFT OR IF SHE HAD BEEN CONVICTED OF

3    THE FORGERY, THAT'S TRUE.   NOW, AND I'M SORRY, DO YOU WANT ME

4    TO --

5          THE COURT: NO, GO AHEAD, I WANT TO KNOW, YEAH.

6          THE WITNESS: IN HER PARTICULAR CASE, THE THEFT WAS A

7    MISDEMEANOR THEFT.

8          THE COURT: OKAY.

9          THE WITNESS: WHICH SHE WAS ACTUALLY PLACED ON -- WE

10   FOUND OUT IN TALKING TO HER, THAT SHE WAS ACTUALLY PLACED ON

11   PROBATION FOR, THAT SHE SUCCESSFULLY COMPLETED THE PROBATION.

12         THE COURT: OKAY.

13         THE WITNESS: AND UNDER TEXAS LAW, SUCCESSFULLY

14   COMPLETING THE PROBATION, PLUS, AND I'M SORRY, I DON'T HAVE

15   THE STATUTE RIGHT IN FRONT OF ME, BUT PLUS SOME YEARS, MAKES

16   HER THEN ELIGIBLE TO BE BACK PLACED ON A JURY.

17         THE COURT: OKAY.   SO THAT'S WHY JUDGE MILLER AT THE

18   END OF HER QUESTIONING SAID YOU ARE HEREBY QUALIFIED --

19         THE WITNESS: YES.

20         THE COURT: AND TOLD HER WHEN TO COME BACK, YEAH.

21         THE WITNESS: AND I DON'T REMEMBER THE EXACT EXCHANGE

22   BETWEEN HE AND MS. CELLERS, BUT IT SEEMS TO ME LIKE I RECALL

23   HIM SPECIALLY TALKING TO HER ABOUT DID SHE GO THROUGH

24   PROBATION AND DID SHE SUCCESSFULLY COMPLETE THE PROBATION; AND

25   ONCE HE HAD HEARD THAT SHE HAD SUCCESSFULLY COMPLETED THE

1  PROBATION, IT WAS HIS OPINION THAT THAT WAS NOT GOING TO BE A

2  DISQUALIFICATION.

3              THE COURT: OKAY, THANK YOU.  I'M SORRY TO INTERRUPT,

4  BUT I JUST DIDN'T WANT TO FORGET THAT QUESTION.

5  Q    (BY MS. GARCIA) DID YOU MAKE A DECISION REGARDING JUROR,

6  PROSPECTIVE JUROR CELLERS EARLY ON, ON WHETHER YOU WANTED HER

7  ON THE JURY OR NOT?

8  A    AFTER HER RESPONSES TO THE QUESTIONS REGARDING HER

9  CONTACT WITH THE POLICE, YES, MA'AM, WE DID.

10 Q    WHAT DID YOU DECIDE?

11 A    WE DECIDED WE DID NOT WANT HER ON THE JURY.

12 Q    WAS THAT BASED ON RACE?

13 A    NO, MA'AM.

14 Q    WHAT LED YOU TO WANT HER OFF OF THE JURY?  BECAUSE OF HER

15 RESPONSES?  HOW DID SHE RESPOND?

16 A    WELL, EVERY TIME I BROUGHT UP A CRIMINAL CHARGE, SHE

17 WOULD AT FIRST DENY, ABSOLUTELY JUST CATEGORICALLY DENY THAT

18 IT WAS HER.  AND IT WASN'T UNTIL I WOULD GET VERY SPECIFIC

19 WITH HER THAT THEN SHE WOULD START REMEMBERING, YOU KNOW, OH,

20 YEAH, I DID GET ARRESTED FOR THEFT, AND OH, YEAH, I DID GET

21 ARRESTED FOR SHOPLIFTING, AND OH, YEAH, I DID GET ARRESTED FOR

22 A FORGERY CHARGE.

23      AND SO I WAS, IT WAS, YOU KNOW, ONE TIME YOU CAN KIND OF

24 UNDERSTAND IT.  THIS WAS, IT SEEMS TO ME LIKE THE LAST ARREST,

25 AND I DON'T REMEMBER IF IT WAS THE FORGERY CHARGE OR THE

1  SHOPLIFTING CHARGE, BUT IT WAS LIKE 1991, WHICH HAD NOT REALLY

2  BEEN THAT LONG BEFORE, AND THEN SHE HAD SOME PRETTY INCREDIBLE

3  STORIES ABOUT HOW SHE GOT CHARGED WITH THE SHOPLIFTING.  SHE

4  CLAIMED THAT I THINK IT WAS A NIECE OR A NEPHEW HAD PUT

5  SOMETHING EITHER IN HER BAG OR IN HER PURSE, AND THEN SHE GOT

6  ARRESTED AS SHE WAS LEAVING THE STORE; AND THAT WASN'T HER

7  FAULT.

8        AND THEN WHEN WE TALKED ABOUT THE FORGERY CHARGE, SHE

9  CAME UP WITH THE STORY THAT HER BOYFRIEND HAD GIVEN HER A

10  CHECK THAT SUPPOSEDLY HAD BEEN WRITTEN BY HIS DAUGHTER, BUT

11  THAT THAT CHECK HAD BEEN STOLEN BY HER BOYFRIEND AND FORGED

12  AND GIVEN TO HER BOYFRIEND.  SO IT JUST -- THE WHOLE THING WAS

13  -- HER EXPLANATIONS WERE RATHER BIZARRE, IF YOU WILL,

14  ESPECIALLY ON THE FORGERY CHARGE, THAT KIND OF US MADE US

15  SUSPECT.

16  Q    DID YOU FIND HER EXPLANATIONS TO BE CREDIBLE?

17  A    NOT ON THE FORGERY CHARGE.  I MEAN, IT WAS VERY

18  CONVOLUTED, AND IT DIDN'T MAKE SENSE THAT SHE WOULD GET

19  ARRESTED FOR FORGERY IF IT WAS HER BOYFRIEND'S DAUGHTER WHOSE

20  CHECK IT WAS THAT SHE PASSED.  NONE OF THAT MADE ANY SENSE.

21  Q    I AM GOING TO SKIP AHEAD.  AS A RESULT OF YOUR PEREMPTORY

22  STRIKES, DO YOU RECALL HOW MANY PEREMPTORY STRIKES YOU USED IN

23  THIS CASE?

24  A    IT SEEMS TO ME LIKE BY THE TIME THE JURY WAS SELECTED, I

25  THINK MAYBE WE USED ABOUT TEN OF OUR FIFTEEN STRIKES.

1   Q     AND DO YOU RECALL THE RACIAL BREAKDOWN OF THOSE TEN?

2   A     IN ALL HONESTY, I DON'T.

3   Q     IF THERE WERE FIVE AFRICAN AMERICANS WOULD YOU DISPUTE

4   THAT?

5   A     NOT IF THAT'S WHAT THE RECORD IS, YES, MA'AM.

6   Q     AS A RESULT OF THE STRIKES, THE DEFENSE CALLED FOR A

7   BATSON HEARING OR MADE A BATSON CHALLENGE AND THE TRIAL COURT

8   HELD A HEARING, IS THAT YOUR RECOLLECTION?

9   A     YES, MA'AM.

10  Q     AND AT THAT POINT IN TIME YOU WERE GIVEN THE OPPORTUNITY

11  TO EXPLAIN WHY YOU STRUCK CERTAIN JURORS?

12  A     YES, MA'AM.

13  Q     AND DO YOU RECALL WHAT YOU MAY HAVE MENTIONED ABOUT JUROR

14  CELLERS?

15  A     I THINK I TALKED TO THE COURT ABOUT THE FACT THAT SHE HAD

16  OMITTED ALL OF HER ARRESTS AND CONTACTS WITH THE POLICE ON HER

17  QUESTIONNAIRE, AND THAT SHE WAS VERY RELUCTANT TO TELL US THE

18  TRUTH ABOUT THOSE; AND THAT HER EXPLANATION, AS I RECALL, I

19  THINK I SAID SOMETHING IN THE RECORD ABOUT HER EXPLANATION OF

20  THIS FORGERY CHARGE WAS RATHER INCREDIBLE THAT SHE WAS GIVING

21  US.  AND, I'M SORRY, BUT I THINK THAT SHE MAY HAVE ALSO "D" AS

22  HER ANSWER TO THE RELEVANT QUESTION.  AND, I'M SORRY, I JUST

23  DON'T RECALL, BUT I WANT TO HAVE THAT -- I WANT TO THINK THAT

24  THAT WAS ALSO PART OF THE DISCUSSION.

25  Q     OKAY.  DO YOU RECALL JUROR NUMBER -- POTENTIAL JUROR

1  NUMBER 44, LADONNA SMITH?

2  A    I MEAN, I REMEMBER HER NOW BECAUSE WE HAVE TALKED ABOUT

3  HER, BUT IN ALL HONESTY, PRIOR TO US TALKING ABOUT HER, NO,

4  MA'AM, I DIDN'T.

5  Q    DURING THE BATSON HEARING IT WAS BROUGHT UP THAT THERE

6  WAS SOME DISPARATE QUESTIONING BETWEEN JUROR CELLERS -- I SAY

7  JUROR, I MEAN TO SAY PROSPECTIVE JUROR CELLERS AND SMITH,

8  BECAUSE SMITH WAS ALLEGED TO HAVE ALSO LIED ABOUT A CRIMINAL

9  CONVICTION.  DO YOU KNOW THAT SHE HAD A CRIMINAL CONVICTION?

10         MR. DUNN:  YOUR HONOR, WE ARE GOING TO OBJECT TO HIM

11  ANSWERING THAT.  HE JUST STATED THAT PRIOR TO THIS HEARING HE

12  DIDN'T REMEMBER ANYTHING ABOUT IT.

13         MS. GARCIA: WELL AT THE TIME OF THE HEARING HE WOULD

14  HAVE REMEMBERED BECAUSE IT IMMEDIATELY FOLLOWED VOIR DIRE.  IN

15  FACT, SHE WAS THE THIRD TO THE LAST JUROR QUESTIONED, AND THAT

16  VERY SAME DAY THEY IMMEDIATELY WENT THROUGH THE JURY SELECTION

17  AND THE BATSON HEARING.  SO ON THE RECORD HE WOULD HAVE BEEN

18  FAMILIAR WITH THAT POTENTIAL JUROR.

19         THE COURT: OKAY.  I AM GOING TO OVERRULE THE

20  OBJECTION AND ALLOW YOU TO ANSWER THE QUESTION AND EXPLAIN

21  WHAT YOU KNEW, AND ALSO, I WANT TO MAKE SURE I UNDERSTAND WHAT

22  YOU KNEW AND WHEN YOU KNEW IT ACTUALLY, SO GO AHEAD.

23  Q    (BY MS. GARCIA) OKAY.  CAN YOU EXPLAIN WHAT YOU KNEW AND

24  WHEN YOU KNEW IT REGARDING THIS?

25  A    IN ALL HONESTY, WE HAD SEEN THE NOTATION IN THE LOCAL

1   RECORDS ABOUT BACK IN 1974 THIS ASC.  AT THAT TIME WE TRIED,

2   WE ASKED EVERYBODY WE COULD THINK OF WHAT THAT MEANT.  THERE

3   WAS, JUST BY WAY OF AN EXPLANATION, THERE WAS ABOUT 1995, 1996

4   THERE WAS A MAJOR CONVERSION, A COMPUTER CONVERSION OF DATA

5   BETWEEN ONE COMPANY AND THE CURRENT SOFTWARE COMPANY THAT WE

6   DO BUSINESS WITH.  AND THERE WAS A LOT OF STUFF THAT JUST KIND

7   OF CAME OVER AND WAS JUST KIND OF LIKE GIVEN A NAME FOR ME.  I

8   MEAN, WE HAD PEOPLE WHO ARE IN OUR SYSTEM THAT ARE LISTED AS

9   BEING ARRESTED FOR TSG.CONV, WHICH IS THE TSG CONVERSION.

10      SO AT THAT TIME WE DIDN'T KNOW WHAT ASC WAS.  I RECALL

11  MS. WRIGHT AND I HAVING SOME SORT OF CONVERSATION ABOUT

12  THINKING THAT IT HAD SOMETHING TO DO WITH MAYBE A CHECK, OR

13  SOMETHING.  I WILL TELL YOU MR. HENRY AND I VISITED A LITTLE

14  BIT THIS MORNING, AND HE RECALLED AND I KIND OF REMEMBER, HAVE

15  A SLIGHT RECOLLECTION OF IT AS WELL, THAT AFTER EITHER THE

16  VOIR DIRE OR AFTER THE TRIAL WAS OVER WE FOUND OUT THAT IT MAY

17  HAVE HAD SOMETHING TO DO WITH HINDERING A SECURED CREDITOR,

18  SOMETHING ALONG THOSE LINES.

19  Q    IS THERE A REASON, CAN YOU THINK OF A REASON WHY YOU

20  WOULDN'T HAVE ASKED HER ABOUT THAT DURING HER VOIR DIRE?

21  A    MORE THAN LIKELY, MY BEST, YOU KNOW, RECOLLECTION IS THAT

22  NUMBER ONE, IT WAS TWENTY PLUS YEARS BEFORE, BEFOREHAND.

23  THERE WAS NOT ANY INDICATION THAT IT WAS ANY KIND OF CRIME

24  INVOLVING ANY SERIOUS MORAL TURPITUDE OR MENTAL STATE.  THE

25  REST OF HER RECORD AT THAT TIME, AS I RECALL, REFLECTED SHE

1  MAY HAVE HAD ONE SPEEDING TICKET, THAT SHE WAS NUMBER 44 ON

2  THE LIST AND WE KNEW WE WEREN'T GOING TO GET DOWN TO HER.   AND

3  AT THAT POINT, AFTER THAT LONG A PROCESS, I WILL JUST BE QUITE

4  BLUNT, WE WERE ALL WORN OUT AND TIRED AND WERE JUST TRYING TO

5  GET THROUGH.

6  Q     AND WAS SHE CONVICTED OF ASC?

7  A     AS WE SIT HERE TODAY I DON'T HAVE A CLUE.

8  Q     OKAY.

9  A     I MEAN, WE WERE NOT ABLE TO FIND ANYTHING TO SHOW THAT

10 SHOWED THAT SHE HAD BEEN CONVICTED OF ANY CRIME.

11 Q     COULD YOU HAVE NOT ASKED HER ABOUT IT BECAUSE SHE WAS

12 WHITE AND YOU WANTED HER ON THE JURY?

13 A     NO, MA'AM.

14 Q     IN FACT, SOME OF THE OTHER JURORS, POTENTIAL JURORS WITH

15 CRIMINAL BACKGROUNDS WERE ALSO WHITE?

16 A     YES, MA'AM.

17 Q     AND SOME YOU DID ASK ABOUT CRIMINAL AND SOME YOU DIDN'T?

18 A     I CAN REMEMBER ONE WE DID NOT ASK OUT OF COURTESY, BUT I

19 THINK PRETTY MUCH EVERYBODY ELSE BETWEEN THAT PERSON AND ALSO

20 MS. SMITH, I THINK WE ASKED EVERYBODY.

21 Q     IF, IN FACT, SHE WAS NOT CONVICTED AND SHE ANSWERED THE

22 QUESTION ON THE JURY QUESTIONNAIRE WERE YOU CONVICTED, IF SHE

23 ANSWERED THAT NO, WOULD THAT BE A TRUTHFUL ANSWER?

24 A     AS FAR AS I KNOW, YES.

25 Q     OKAY.

1        MS. GARCIA: I DON'T HAVE ANYTHING ELSE.

2        THE COURT: THANK YOU.  ALL RIGHT.  MR. DUNN.

3        MR. DUNN: MAY I PROCEED, YOUR HONOR?

4        THE COURT: YES, JUST A SECOND.

5                    CROSS EXAMINATION

6  BY MR. DUNN:

7  Q     GOOD AFTERNOON, MR. SMITH.

8  A     GOOD AFTERNOON.

9        THE COURT: GO AHEAD.

10 Q     MR. SMITH, WE DIDN'T HAVE ANY BLACK JURORS SERVE ON MR.

11 MURPHY'S CASE IN THIS COUNTY, DID WE?

12 A     I FOUND THAT OUT TODAY, AS A MATTER OF FACT.  I DID NOT

13 RECALL WHETHER WE DID OR DIDN'T.

14 Q     SO YOU FOUND OUT TODAY THAT HE WAS SENTENCED TO DEATH BY

15 AN ALL WHITE JURY TODAY?

16 A     YES. I MEAN I'M SURE I KNEW THAT BACK IN 1998, BUT I

17 DIDN'T RECALL.

18 Q     TALKING ABOUT YOUR PEREMPTORY STRIKES, YOU TESTIFIED THAT

19 YOU USED TEN OUT OF YOUR FIFTEEN, SO YOU HAD FIVE LEFT?

20 A     I BELIEVE THAT'S CORRECT.

21 Q     DO YOU REMEMBER WHY YOU DIDN'T CHOOSE TO USE THE

22 ADDITIONAL FIVE?

23 A     BECAUSE WE GOT TWELVE JURORS.

24 Q     HAVE YOU WENT BACK THROUGH THE TRANSCRIPT AND REVIEWED

25 THE VOIR DIRE?

1  A    I HAVE LOOKED AT BITS AND PIECES OF IT.  I HAVE NOT

2  LOOKED THROUGH THE WHOLE THING, NO, SIR.

3  Q    THE PARTS THAT YOU LOOKED THROUGH, DID YOU SEE AT ANY

4  TIME THAT YOU WERE ASKING MINORITY JURORS DIFFERENT QUESTIONS

5  THAN WHITE JURORS?

6  A    NO, SIR, I DON'T BELIEVE SO.

7  Q    IF THE RECORD WOULD REFLECT OTHERWISE, WHAT WOULD YOU SAY

8  TO THAT?

9  A    MY QUESTIONS ALWAYS HAVE TO DO WITH WHAT THE

10  QUESTIONNAIRES REVEAL TO US, SO, I MEAN, EVERY JUROR, I GUESS

11  YOU COULD SAY THAT EVERY JUROR IS ASKED DIFFERENT QUESTIONS BY

12  ME.  NOT EVERY JUROR ANSWERS THE QUESTIONNAIRE THE SAME.

13  Q    AND YOU SAID THAT YOU DON'T USE A SCRIPT WHEN YOU DO YOUR

14  VOIR DIRE?

15  A    THAT'S CORRECT.  I MEAN, I USE AN OUTLINE OF THE MAJOR

16  TOPICS OR ISSUES, BUT, NO, I DON'T.  I DON'T HAVE A SCRIPT

17  QUESTION AND ANSWER.

18  Q    THE OUTLINE THAT YOU USE, IS IT APPLIED TO EACH JUROR

19  REGARDLESS OF COLOR?

20  A    IT IS THE SAME OUTLINE FOR EVERYBODY, YES, SIR.

21  Q    SO HOW WOULD YOU EXPLAIN IF YOU ASKED QUESTIONS

22  DIFFERENTLY OF ONE JUROR THAT WAS WHITE WITH A CRIMINAL RECORD

23  AND THEN TURNED AROUND AND ASKED THE QUESTION DIFFERENT OF A

24  BLACK JUROR WHO HAD A CRIMINAL RECORD?

25  A    MR. DUNN, I GUESS I WOULD HAVE TO ASK YOU TO SHOW ME

1   WHERE I DID THAT.   I AM NOT SAYING I DIDN'T USE MAYBE

2   DIFFERENT WORDS IN ASKING THOSE QUESTIONS, BUT THAT'S JUST

3   BECAUSE I DON'T HAVE A SCRIPT.

4   Q     SPECIFICALLY TALKING ABOUT DONNA SMITH, SHE WAS THE WHITE

5   JUROR.

6   A     YES, SIR.

7   Q     HAVE YOU REVIEWED THE TRANSCRIPT AND THE QUESTIONS THAT

8   YOU ASKED HER?

9   A     I DON'T KNOW IF THAT WAS PART OF WHAT I LOOKED AT.   I

10  GUESS IT MAY HAVE BEEN, YES, SIR.

11  Q     AND YOU ASKED HER 24 PAGES OF QUESTIONS, CORRECT?

12  A     IF THAT'S WHAT THE RECORD SHOWS, YES, SIR.

13  Q     WOULD IT SURPRISE YOU TO KNOW THAT ALL OF THE QUESTIONS

14  THAT YOU ASKED HAD TO DO WITH THE CASE, THE SPECIAL ISSUES,

15  THINGS THAT PERTAIN TO THE CASE TO DETERMINE WHETHER OR NOT

16  SHE WOULD BE A VALUABLE JUROR FOR YOU?   WOULD THAT SURPRISE

17  YOU IF YOU ASKED THOSE TYPE OF QUESTIONS?

18  A     NO, SIR.

19  Q     AND YOU SAY THAT YOU HAVE ALSO REVIEWED DONNA CELLERS'

20  TRANSCRIPT, THIS IS THE BLACK JUROR?

21  A     YES, SIR.

22  Q     BASICALLY, WHAT YOU DO IN HER VOIR DIRE IS YOU GO

23  DIRECTLY TO WHETHER OR NOT SHE HAD A CRIMINAL HISTORY, ISN'T

24  THAT CORRECT?

25  A     YES, SIR.

1  Q    SHE WASN'T ASKED ANY OTHER TYPE OF QUESTIONS, OTHER THAN,

2  I BELIEVE, ONE QUESTION ON REASONABLE DOUBT, BUT OTHER THAN

3  THAT, NO OTHER TYPES OF QUESTIONS?

4  A    THAT'S CORRECT.

5  Q    YOU TESTIFIED EARLIER THAT SHE WAS VERY RELUCTANT TO TELL

6  YOU THAT SHE HAD BEEN CONVICTED?

7  A    YES, SIR.

8  Q    I NOTE ON HERE DURING THE FIRST COUPLE OF PAGES YOU ASKED

9  HER THE QUESTION: OTHER THAN A TRAFFIC OFFENSE?  AND SHE SAYS:

10  YES, MA'AM.  AND BY A TRAFFIC OFFENSE, THAT'S BASICALLY JUST

11  TALKING ABOUT A SPEEDING TICKET OR RAN A STOP SIGN.  AND YOU

12  ASKED: IS THERE ANY OTHER THING THAT YOU CAN REMEMBER?  AND

13  RIGHT AWAY SHE VOLUNTEERS THAT SHE WAS CONVICTED.  SO, HOW IS

14  THAT BEING RELUCTANT TO ANSWER YOU?

15  A    WELL, I THINK IF YOU LOOK ON IN THE VOIR DIRE WITH MS.

16  CELLERS, THERE ARE AT LEAST, I THINK, TWO OTHER INSTANCES

17  WHERE SHE SAYS THAT SHE DOESN'T KNOW ANYTHING ABOUT THE

18  CONTACTS WITH THE POLICE THAT I AM ASKING ABOUT.

19  Q    YOU SAY TO HER: I NOTICE ON PAGE 6, MS. CELLERS, THAT ON

20  QUESTION 16 THE QUESTION ASKS YOU: HAVE YOU OR ANY MEMBER OR

21  YOUR FAMILY EVER BEEN ARRESTED OR CHARGED WITH ANY CRIME OTHER

22  THAN A TRAFFIC OFFENSE?  SHE SAYS: UH-HUH.  AND YOU SAY -- AND

23  YOU INDICATED NO.  THEN YOU ASK HER: NOW, MS. CELLERS, LET ME

24  TELL YOU THAT I KNOW WHEN Y'ALL WERE ASKED THESE THINGS, I

25  KNOW YOU ALL FELT A LITTLE BIT OF RUSH COMING ON, AND FINALLY

1  SHE COMES OUT AND SAYS, YOU KNOW, THAT SHE HAS BEEN ARRESTED

2  FOR THE THEFT.   IS THAT BEING ELUSIVE?

3  A      THAT WAS ALWAYS MY -- THAT'S MY STANDARD APPROACH WITH

4  FOLKS WHO DON'T PUT STUFF IN THEIR QUESTIONNAIRES ABOUT THEIR

5  CONTACTS, THEIR CRIMINAL CONTACTS, BECAUSE I WANT TO STAND --

6  I DON'T WANT TO STAND AT THE PODIUM AND BASICALLY ACCUSE THEM

7  OF BEING A LIAR.   I WANT TO TRY TO GIVE THEM AN OUT AND AN

8  OPPORTUNITY TO GO AHEAD AND TELL US ABOUT THOSE INSTANCES.

9  Q      AND THEN FURTHER IN THE SECOND INSTANCE, THE LINE OF

10 QUESTIONING, YOU ASK HER: OKAY, MS. CELLERS, LET ME ASK YOU

11 BACK IN 1985 WERE YOU EVER ON PROBATION? AND SHE SAYS: ME?

12 YOU SAY: YES, MA'AM.   AND SHE SAYS: IN '85?   YOU SAY: YES,

13 MA'AM, FOR HAVING A THEFT CONVICTION.   AND SHE SAYS: OH, YEAH,

14 OKAY.   OKAY.   THAT'S NOT BEING VERY RELUCTANT, IS IT?

15 A      WELL, READING IT ON A BLACK AND WHITE PAGE, IT DOESN'T

16 QUITE HAVE THE EFFECT AS IT DOES WHEN I AM LOOKING AT HER FACE

17 TO FACE AND SHE IS LOOKING AT ME LIKE, YOU KNOW, ME?

18 Q      SO SHE IS MAKING NON-VERBAL EXPRESSIONS AT YOU?

19 A      OH, SURE, YES.   ABSOLUTELY.

20 Q      OKAY.

21 A      I MEAN, IT WAS VERY OBVIOUS THAT, YOU KNOW, SHE WAS

22 ATTEMPTING TO DENY IT, UNTIL I MADE IT VERY CLEAR THAT I KNEW

23 ABOUT THE CONVICTION.

24 Q      AND THAT'S WHERE YOU PICKED UP HER ELUSIVENESS WAS FROM

25 HER FACIAL EXPRESSIONS?

1  A    OH, ABSOLUTELY.

2  Q    AND YOU ASKED HER ABOUT THE FORGERY BACK IN '91, AND SHE

3  SAYS -- STARTS TELLING YOU ABOUT THE FACTS OF IT, CORRECT?

4  A    I DON'T REMEMBER HER IMMEDIATELY START TALKING ABOUT THE

5  FACTS.  I THINK AT FIRST, IF I AM NOT MISTAKEN, I THINK AT

6  FIRST SHE EITHER DENIED IT OR ACTED LIKE, AGAIN, LIKE SHE

7  DIDN'T KNOW WHAT I WAS TALKING ABOUT.

8  Q    NOW THE EASIEST WAY, TALKING ABOUT THE JUROR LADONNA

9  SMITH, WHO IS WHITE, THE EASIEST WAY TO FIND OUT WHAT ASC

10 MEANS WOULD BE TO DO WHAT?

11 A    WE CONTACTED B.I.C. AND ASKED THEM IF THEY COULD TELL US

12 WHAT IT MEANT.

13 Q    DID YOU THINK ABOUT ASKING HER?

14 A    WELL ACTUALLY, WE DID HAVE A NOTATION ON THE, I THINK ON

15 THE SHEET THAT WE TURNED OVER, THAT WE WERE -- THAT WE NEEDED

16 TO ASK HER ABOUT IT.

17 Q    BUT YOU NEVER ASKED THAT QUESTION?

18 A    I NEVER DID, NO, SIR.

19 Q    YOU STATED EARLIER THAT YOU HAD NO CLUE WHEN YOU TRIED

20 THE CASE WHAT ASC MEANT.  SO IT COULD HAVE BEEN A FINAL FELONY

21 CONVICTION, IT COULD HAVE BEEN FOR ANYTHING, CORRECT?

22 A    WELL, IT COULD HAVE BEEN FOR ANYTHING.  I WOULD NOT THINK

23 THAT IT WOULD HAVE BEEN A FELONY, BECAUSE IT WOULD HAVE BEEN

24 NOTED ON THE COMPUTER, AS WELL AS IN OUR RECORDS, IF IT HAD

25 BEEN A FELONY.

1  Q      BUT YOU SAID THAT THIS NEW COMPUTER PROGRAM HAD JUST --

2  DID IT RANDOMLY GENERATE LETTERS AND IT JUST ASSIGNED THEM?

3  A      IT -- I CAN ONLY EXPLAIN TO YOU THE WAY IT HAS BEEN

4  EXPLAINED TO ME, MR. DUNN, AND THAT WAS, IS THAT IT ATTEMPTED

5  TO MATCH UP ARREST CODES WITH WHAT OUR NEW VENDOR USED, WHICH

6  ARE THE ARREST CODES THAT ARE PROMULGATED BY THE TEXAS

7  DEPARTMENT OF PUBLIC SAFETY, WITH THE OLD CODES THAT THEY USED

8  TO USE BACK IN THE SEVENTIES AND EVEN BEFORE; AND IT TRIED TO

9  MATCH THEM UP, AND EVEN SOMETIMES WHEN IT COULDN'T, LIKE I

10 SAID, IT WOULD GIVE YOU AN ARREST FOR TSG.CONV.

11 Q      OKAY.  AND YOU STATED TODAY THAT THERE MIGHT BE SOME

12 INDICATION THAT IT COULD BE SOMETHING ABOUT HINDERING A

13 SECURED CREDITOR?

14 A      THAT'S WHAT MS. WRIGHT CAME UP WITH, AND I WILL BE QUITE

15 HONEST WITH YOU, I DON'T KNOW WHERE SHE CAME UP WITH THAT.  I

16 KNOW THAT WHEN WE SAW THAT, SHE CONTACTED B.I.C., WHICH IS THE

17 BI-STATE INFORMATION CENTER, THAT'S WHAT IT WAS CALLED BACK

18 THEN, AND ASKED THEM IF THEY KNEW WHAT ASC MEANT.  NONE OF

19 THEM KNEW WHAT ASC MEANT.  WE LOOKED THROUGH -- WE HAVE A CARD

20 FILE SYSTEM THAT BACKS UP THE COMPUTER SYSTEM.  WE COULD NOT

21 FIND A CARD ON A LADY, WHICH WOULD HAVE SHOWN US THAT SHE HAD

22 A FILE THAT HAD ACTUALLY BEEN SUBMITTED TO OUR OFFICE FOR

23 PROSECUTION, WHICH WAS ANOTHER REASON WHY IT LED US TO BELIEVE

24 THAT THIS WAS JUST AN ARREST OR CONTACT WITH POLICE, AS

25 OPPOSED TO A FORMAL CHARGE.  WE COULDN'T FIND ANYTHING IN THE

1   DISTRICT CLERK'S RECORDS INDICATING THAT ANY FORMAL CHARGE OR

2   CASE HAD EVER BEEN FILED AGAINST HER.

3   Q   DID YOU CHECK WITH TCIC OR NCIC?

4   A   NO, SIR, WE DID NOT.

5   Q   DID YOU HAVE THAT AT YOUR DISPOSAL?

6   A   WE DID HAVE THAT AT OUR DISPOSAL, BUT IN A SENSE THAT WE

7   HAVE ACCESS TO IT, BUT WE ARE PROHIBITED FROM USING THAT.

8   Q   SO THE ONLY THING THAT YOU COULD CHECK WERE LOCAL

9   RECORDS?

10   A   YES, SIR.

11   Q   HINDERING A SECURED CREDITOR, IS THAT A CRIME OF MORAL

12   TURPITUDE?

13   A   IT CAN BE, YES.

14   Q   SO THAT MIGHT BE IMPORTANT WHEN YOU ARE PICKING A JURY TO

15   KNOW IF AN INDIVIDUAL ON THE JURY WAS CONVICTED OR CHARGED

16   WITH A CRIME OF MORAL TURPITUDE, CORRECT?

17   A   YES, SIR.

18   Q   JUST AS IMPORTANT AS A THEFT OR A FORGERY?

19   A   I WOULD DISAGREE WITH YOU ON THE FORGERY PART.

20   Q   TELL ME HOW THOSE TWO WOULD BE DIFFERENT.

21   A   WELL, FORGERY ENTAILS EITHER CREATING A FALSE DOCUMENT OR

22   STEALING SOMEBODY ELSE'S DOCUMENT AND THEN FALSIFYING THAT

23   DOCUMENT AND PASSING IT.  WE HAVE HINDERING A SECURED CREDITOR

24   CASES THAT ARE BROUGHT TO US BY, FOR INSTANCE, BANKS BY PEOPLE

25   WHO ARE IN BUSINESS AND HAVE LOANS AND THEY GO BELLY UP, AND

1   TO TRY TO SAVE THEIR BUSINESS THEY WILL SELL THEIR INVENTORY

2   AND NOT SEND THE MONEY TO THE BANK, LIKE THEY ARE SUPPOSED TO

3   UNDER THEIR AGREEMENT, BUT WILL USE IT TO TRY TO KEEP THE

4   BUSINESS OPERATING.

5       IN EIGHTEEN YEARS OF PROSECUTION, I JUST KIND OF HAVE A

6   HARD TIME MAKING THAT PERSON OUT TO BE A CRIMINAL.  NOW, THERE

7   IS OBVIOUSLY THE OTHER SIDE OF HINDERING A SECURED CREDITOR

8   CASE WHERE, FOR INSTANCE, SOMEBODY BORROWS MONEY ON A CAR AND

9   DECIDES THEY DON'T WANT TO MAKE THE PAYMENT ON IT, AND THEY

10  JUST GO OUT AND SELL IT TO TRY TO DEFRAUD THE CREDITOR.  SO

11  THERE ARE DIFFERENT DEGREES, IF YOU WILL, OF HINDERING A

12  SECURED CREDITOR.

13  Q    SO YOU ARE SAYING THAT IF A BANK LOSES THEIR MONEY, IT

14  REALLY DOESN'T MATTER?

15  A    NO, I AM NOT SAYING THAT.  WHAT I AM SAYING IS, IS THAT

16  YOU KIND OF HAVE TO LOOK A LITTLE BIT PAST THAT CHARGE TO SEE

17  WHAT THE MOTIVE OR WHAT THE FACTS WERE IN THAT PARTICULAR CASE

18  BEFORE YOU CAN MAKE A DETERMINATION THAT SOMEBODY HAS ACTUALLY

19  COMMITTED A CRIME OF MORAL TURPITUDE.

20  Q    YOU TESTIFIED ABOUT YOUR OUTLINE THAT YOU USE DURING VOIR

21  DIRE AND THE FACT THAT YOU HAD SOME HOT TOPICS?

22  A    YES, SIR.

23  Q    AND YOU TESTIFIED THAT SOME OF THE HOT TOPICS WERE

24  BASICALLY THE FACTS OF THE CASE, THE AGE OF THE DEFENDANT, THE

25  CO-DEFENDANT, ACCOMPLICE THEORIES, THE SERIOUSNESS OF THE

1  OFFENSE, ALL OF THOSE HOT TOPICS WERE TALKED ABOUT WITH

2  LADONNA SMITH, CORRECT?

3  A    YES, SIR.

4  Q    BUT WHEN IT CAME DONNA CELLERS' TURN, NONE OF THOSE

5  TOPICS WERE TALKED ABOUT, CORRECT?

6  A    THAT'S CORRECT.

7  Q    WHY DO YOU SUPPOSE THAT WAS?

8  A    WELL, BECAUSE BY THE TIME WE WERE THROUGH TALKING WITH

9  MS. CELLERS ABOUT THE FORGERY CHARGE AND THE EXCHANGE THAT HAD

10  GONE ON UP TO THAT POINT, WE HAD MADE THE DETERMINATION THAT

11  WE WERE NOT GOING TO ACCEPT HER.  SO THERE WASN'T REALLY ANY

12  REASON TO SPEND OR WASTE MS. CELLERS' TIME, OR THE COURT'S

13  TIME OR OUR TIME WHEN WE COULD MOVE ON TO OTHER JURORS THAT

14  POTENTIALLY MIGHT BE ON THE JURY.

15  Q    AND YOU SPECIFICALLY, WHEN YOU ARE BEING QUESTIONED BY

16  THE ATTORNEY GENERAL, YOU STATED THAT YOU SPECIALLY REMEMBERED

17  CELLERS, AND YOU SPECIFICALLY REMEMBERED LADONNA SMITH.  IS

18  THAT FROM YOU REVIEWING THE TRANSCRIPTS?  OR LET ME IN ON, ON

19  WHAT YOU WERE USING TO RECALL WHAT YOU TESTIFIED TO.

20  A    WELL, I, BESIDES BEING THERE, I ALSO WROTE THE APPEAL IN

21  THE COURT OF CRIMINAL APPEALS, AND ALSO RESPONDED TO THE WRIT,

22  SO I VISITED THIS ISSUE AT LEAST TWICE BEFORE, SO THAT HAS

23  KIND OF KEPT ME ABREAST OF THOSE TWO PARTICULAR JURORS, AS

24  WELL AS I LOOKED AGAIN AT SOME OF THE TRANSCRIPT TODAY OVER

25  LUNCH.

1   Q     AND YOU ARE TALKING ABOUT THERE IS AN IMPORTANT

2   DIFFERENCE BETWEEN IF YOU ARE ON PROBATION FOR SOMETHING AND

3   IF YOU ARE CONVICTED FOR SOMETHING. WHEN YOU ARE LOOKING AT IT

4   TO PICK A JURY, YOU WANT TO KNOW THE DIFFERENCE OF THOSE ITEMS

5   IF A PERSON HAS A CRIMINAL HISTORY, CORRECT?

6   A     YES, SIR.

7   Q     BUT THAT WAS NOT GONE INTO WITH LADONNA SMITH, CORRECT?

8   A     THAT'S CORRECT, YES, SIR.  AND AGAIN, WE KNEW THAT MS.

9   SMITH HAD A VERY LOW PROBABILITY OF BEING ON THE JURY.  I

10  THINK MATHEMATICALLY, IF I AM NOT INCORRECT, WE WOULD HAVE HAD

11  TO HAVE QUITE A FEW JURORS FALL OUT THAT HAD ALREADY BEEN

12  QUALIFIED --

13  Q     RIGHT.

14  A     -- BEFORE WE WOULD HAVE EVER BEEN ABLE TO EVEN GET CLOSE

15  TO MS. SMITH AS A POTENTIAL JUROR.

16  Q     SO IF YOU TAKE THESE TRANSCRIPTS, AND I GUESS YOU HAVE,

17  AND YOU HAVE READ THE CELLER'S VOIR DIRE, AND YOU HAVE READ

18  THE SMITH VOIR DIRE.  AND EACH OF THEM, HAVE YOU SEEN THAT

19  EXHIBIT WITH THE CRIMINAL CONVICTIONS ON IT?

20  A     THE PAPER THAT WE PROVIDED TO THE DEFENSE COUNSEL?

21  Q     RIGHT, DEFENSE EXHIBIT 1?

22  A     YES, SIR.

23  Q     BOTH OF THESE PEOPLE HAVE SOMETHING ON THAT LIST, AND ONE

24  GETS ASKED QUESTIONS ABOUT IT AND ONE DOESN'T, AND ONE GETS

25  ASKED QUESTIONS ABOUT RELEVANT ISSUES OF THE CASE AND ONE

1  DOESN'T, AND ONE IS BLACK AND ONE IS WHITE, WHAT DOES THAT

2  MEAN TO YOU?

3  A    IT DOESN'T REALLY MEAN ANYTHING TO ME, MR. DUNN, BECAUSE

4  EACH JUROR THAT COMES IN TO THAT VOIR DIRE PROCESS COMES IN ON

5  THEIR OWN AND WITH THEIR OWN LUGGAGE, IF YOU WILL.  AND WE

6  TREAT THEM AS AN INDIVIDUAL WITH THAT LUGGAGE, AND WE HAVE TO

7  DEAL WITH THOSE ISSUES THAT THEY BRING INTO THE COURTROOM.

8          MR. DUNN: I WILL PASS THE WITNESS, YOUR HONOR.

9          THE COURT: OKAY.  ANY OTHER QUESTIONS?

10         MS. GARCIA: JUST A FEW.

11                  REDIRECT EXAMINATION

12  BY MS. GARCIA:

13  Q    IN YOUR EXPERIENCE SELECTING JURIES, WOULD YOU EVER

14  ACCEPT ANY JUROR, REGARDLESS OF COLOR, WHO LIED ABOUT A

15  CONVICTION AND THEN APPEARED EVASIVE WHEN YOU ASKED THEM ABOUT

16  IT?

17  A    NO, MA'AM.  AND I DON'T REMEMBER, SEEMS LIKE THERE WERE A

18  COUPLE OR THREE OTHER OF THESE JURORS WHO WERE CAUCASIAN WHO

19  HAD CRIMINAL HISTORIES THAT WE EITHER STRUCK OR DIDN'T TAKE.

20  Q    NOW, DO YOU RECALL IF ANY OF THE POTENTIAL JURORS WHO HAD

21  CRIMINAL BACKGROUNDS SERVED ON THE JURY?

22  A    NO, NONE OF THEM DID.

23  Q    NONE OF THEM DID.  DO YOU KNOW IF YOU WOULD HAVE ACCEPTED

24  JUROR, PROSPECTIVE JUROR SMITH, NUMBER 44, ASSUMING SEVERAL

25  PEOPLE WOULD HAVE DROPPED OUT?

1   A    IN ALL HONESTY, NO, MA'AM, WE WOULDN'T, BECAUSE WE

2   PROBABLY WOULD NOT HAVE TAKEN THAT CHANCE ON WHAT THAT ASC

3   MEANT. AND ALL THINGS BEING EQUAL, WE WOULD HAVE PROBABLY

4   PASSED HER BY.

5   Q    OKAY.   THANK YOU.

6            THE COURT: ANY OTHER QUESTIONS?

7            MR. DUNN: NO, YOUR HONOR.

8            THE COURT: ALL RIGHT.   YOU MAY STEP DOWN, MR. SMITH.

9   DOES ANYBODY NEED MR. SMITH ANYMORE?   YOU ARE WELCOME TO STAY,

10  BUT IF YOU NEED TO GET BACK TO THE OFFICE, YOU CAN.   ALL

11  RIGHT. ANY OTHER WITNESSES, MS. GARCIA?

12           MS. GARCIA: NO, THAT'S IT.

13           THE COURT: ALL RIGHT.   MR. DUNN, DID YOU HAVE A

14  WITNESS YOU WANTED TO CALL?

15           MR. DUNN: YES, YOUR HONOR, WE WOULD LIKE TO CALL

16  CRAIG HENRY.

17           THE COURT: ALL RIGHT.   WOULD YOU RAISE YOUR RIGHT

18  HAND.

19      (WITNESS SWORN)

20           MR. DUNN: MAY I PROCEED, YOUR HONOR?

21           THE COURT: YES, YOU CERTAINLY MAY.

22           CRAIG L. HENRY, DEFENDANT'S WITNESS, SWORN

23                     DIRECT EXAMINATION

24  BY MR. DUNN

25  Q    MR. HENRY, IF YOU COULD STATE YOUR FULL NAME FOR THE

1  RECORD.

2  A     CRAIG L. HENRY.

3  Q     AND TELL THE JUDGE YOUR RELATION TO THIS CASE.

4  A     I WAS BOTH MR. MURPHY'S TRIAL COUNSEL AND DIRECT APPEAL

5  COUNSEL.

6  Q     DO YOU RECALL THE YEAR WHEN THE CASE WAS TRIED?

7  A     I BELIEVE IT WAS IN '98.

8  Q     AND DID YOU HAVE THE OPPORTUNITY TO SIT IN DURING THE

9  ENTIRE VOIR DIRE OF THE CASE?

10 A     YES.

11 Q     DID YOU NOTICE ANY DISPARATE QUESTIONING OF THE JURORS IN

12 THIS CASE?

13 A     IT APPEARED TO ME THAT ON EACH OCCASION THAT AN AFRICAN

14 AMERICAN JUROR WOULD TAKE THE STAND TO BE VOIR DIRED, THE

15 STATE WOULD IMMEDIATELY FIRST START OFF THEIR QUESTIONING WITH

16 THAT JUROR'S UNDERSTANDING OR BELIEF OF WHAT WAS MEANT BY

17 REASONABLE DOUBT.  AND THEN THEY WOULD ALSO ASK AFRICAN

18 AMERICAN JURORS WHETHER THEY HAD BEEN CONVICTED OF ANY

19 CRIMINAL OFFENSE, WHICH WAS DIAMETRICALLY OPPOSED TO HOW THE

20 STATE APPROACHED THE CAUCASIAN JURORS WHERE THE STATE WOULD

21 START OUT WITH EXPLAINING FIRST WHAT CAPITAL MURDER WAS AND

22 WHAT CIRCUMSTANCES THE STATE COULD CHARGE A PERSON WITH

23 CAPITAL MURDER, AND THEN GOING INTO THE SPECIAL ISSUES AND

24 PUTTING THE STATE'S SLANT ON THE SPECIAL ISSUES.

25 Q     AND YOU ARE TESTIFYING TO THAT AS NOT ONLY THE TRIAL

1  ATTORNEY, BUT YOU ARE THE ATTORNEY THAT ALSO DID THE APPEAL,

2  CORRECT?

3  A    CORRECT.

4  Q    AND A LIKE ISSUE WAS RAISED IN THE APPEAL, CORRECT?

5  A    THAT'S CORRECT.

6  Q    NOW WHY WOULD A TRIAL ATTORNEY GO INTO REASONABLE DOUBT?

7  IS THAT AN EASY ISSUE THAT IF YOU ANSWER WRONG YOU ARE KNOCKED

8  OFF THE JURY, OR WHY WOULD THEY FOCUS ON THAT?

9  A    HISTORICALLY IN BOWIE COUNTY, MY OPINION IS THAT MOST

10  AFRICANS AMERICANS IN BOWIE COUNTY ARE SOUTHERN BAPTISTS, WERE

11  RAISED SOUTHERN BAPTIST, WHICH JUST THROUGH MY EXPERIENCES,

12  CAUSES THEM TO HAVE A DIFFERENT UNDERSTANDING ORIGINALLY OF

13  WHAT IS MEANT BY REASONABLE DOUBT.  SO IT WOULD BE A METHOD

14  THE STATE COULD PERHAPS GET AN AFRICAN AMERICAN JUROR TO

15  DISQUALIFY THEMSELVES.

16  Q    AND THE STATE IN THIS CASE DID INDEED END UP WITH AN ALL

17  WHITE JURY, IS THAT CORRECT?

18  A    THAT'S CORRECT.

19  Q    AND OUT OF A HUNDRED AND SOME ODD PEOPLE THAT SHOWED UP,

20  SIX OF THEM WERE BLACK?

21  A    THAT'S CORRECT.

22  Q    FIVE STRUCK BY THE STATE?

23  A    CORRECT.

24  Q    SPECIFICALLY TALKING ABOUT MINORITY JUROR DONNA CELLERS

25  AND LADONNA SMITH, WHO WAS A WHITE JUROR, YOU HEARD TESTIMONY

1   THAT BOTH OF THESE PEOPLE POSSIBLY HAD CRIMINAL ARRESTS OR

2   CRIMINAL CONVICTIONS?

3   A     YES.

4   Q     HOW DID YOU SEE THEM TREATED DIFFERENTLY BY THE

5   PROSECUTION?

6   A     AGAIN, IT FITS THE PATTERN THAT I PREVIOUSLY TESTIFIED

7   TO.  MS. CELLERS WAS IMMEDIATELY, BASED ON MY RECOLLECTION,

8   QUESTIONED CONCERNING HER CRIMINAL HISTORY.  THE WHITE JUROR,

9   MS. SMITH, WAS GIVEN MORE OF THE OUTLINE, THE TYPICAL OUTLINE

10  THAT WAS USED BY THE STATE TO GO INTO WHAT CAPITAL MURDER WAS,

11  WHAT THE SPECIAL ISSUES THAT WOULD BE APPLICABLE TO THE CASE,

12  THE JUROR'S UNDERSTANDING OF THOSE SPECIAL ISSUES; WHEREAS

13  WITH MS. CELLERS, THE STATE NEVER TOUCHED UPON ANY OF THE

14  SPECIAL ISSUES OR, IF MY MEMORY IS CORRECT, WHAT CIRCUMSTANCES

15  WOULD SUPPORT A PROSECUTION FOR CAPITAL MURDER.

16  Q     DID YOU ACTUALLY PHYSICALLY SEE A QUESTIONNAIRE SITTING

17  OUT THAT THEY, NOT A QUESTIONNAIRE, AN OUTLINE THAT THEY USED?

18  DID YOU SEE A WRITTEN OUTLINE ON THEIR DESK?

19  A     ALL ATTORNEYS WOULD TYPICALLY HAVE A TRIAL NOTEBOOK.  I

20  HAD ONE, THE STATE EACH HAD ONE, AND WE WOULD CARRY THAT

21  MATERIAL TO THE PODIUM FOR USE IN VOIR DIRE.

22  Q     THERE WAS SOME TESTIMONY EARLIER ABOUT DONNA CELLERS AND

23  SOMETHING ABOUT A NANNY BEING RELATED TO ONE OF HER RELATIVES

24  THAT HELPED RAISE YOU OR SOMETHING.  CAN YOU CLARIFY THAT

25  ISSUE FOR THE COURT?

1  Q      CORRECT.   CORRECT.

2          MR. DUNN: I WILL PASS THE WITNESS, YOUR HONOR.

3          THE COURT: ALL RIGHT.

4                     CROSS EXAMINATION

5  BY MS. GARCIA:

6  Q      MR. HENRY --

7  A      HELLO.

8  Q      -- DO YOU RECALL GREAKER ROBINSON AS A POTENTIAL JUROR?

9  A      NO, MA'AM.

10 Q      GREAKER ROBINSON, WOULD YOU DISPUTE, IS ONE OF THE BLACK

11 JURORS WITH A CRIMINAL BACKGROUND?

12 A      I DON'T HAVE ANY INDEPENDENT KNOWLEDGE WITHOUT LOOKING AT

13 THE RECORD.

14 Q      OKAY.

15 A      I HAVE NOT SEEN THE LIST SINCE THE TRIAL.

16 Q      OKAY.  SO YOU WOULDN'T REMEMBER, THEN, WHETHER GREAKER

17 ROBINSON WAS AFRICAN AMERICAN AND WHETHER SHE HAD A CRIMINAL

18 BACKGROUND?

19 A      MY RECOLLECTION THROUGH BRIEFLY READING THE BATSON

20 HEARING, IS THAT GREAKER ROBINSON WAS AFRICAN AMERICAN, BUT

21 THAT'S JUST WHAT I HAVE DONE PREVIOUS TO COMING IN HERE TODAY.

22 Q      AND YOU STATED THAT THE STATE FRONT-LOADED ALL OF THEIR

23 QUESTIONS TO THE AFRICAN AMERICAN JURORS WITH QUESTIONS ABOUT

24 EXECUTIONS AND CRIMINAL HISTORY, IF THERE WAS SOME?

25 A      WELL, IT WAS REASONABLE, THEIR UNDERSTANDING OF

1   REASONABLE DOUBT AND CRIMINAL HISTORIES.

2   Q     OKAY.   DO YOU REMEMBER IF AND WHEN THE STATE ASKED

3   GREAKER ROBINSON ABOUT HER CRIMINAL HISTORY DURING HER VOIR

4   DIRE?

5   A     AGAIN, I DON'T -- I DON'T HAVE THE RECORD IN FRONT OF ME.

6   Q     OKAY.   BUT YOU STATED THAT THEY ALWAYS ASKED THE AFRICAN

7   AMERICAN JURORS EARLY ON IN THE VOIR DIRE ABOUT THEIR CRIMINAL

8   BACKGROUND?

9   A     IT WAS A PATTERN, YES.

10  Q     OKAY.   WOULD YOU DISPUTE THAT GREAKER ROBINSON, THE STATE

11  ASKED HER ABOUT HER CRIMINAL HISTORY ON REDIRECT?

12            MR. DUNN: YOUR HONOR, WE WOULD OBJECT TO THAT

13  QUESTION.   HE SAID HE DIDN'T HAVE KNOWLEDGE OF THAT.   I THINK

14  IT COULD EASILY BE SETTLED BY LOOKING IN THE RECORD.

15            THE COURT: I AM GOING TO ALLOW IT.   GO AHEAD, AND

16  YOU ARE LAYING A FOUNDATION. YOU CAN CONTINUE.

17            MS. GARCIA: WELL, I JUST BASED IT ON THE FACT THAT

18  HE STATED THAT WITH ALL THE AFRICAN AMERICAN JURORS, HE ASKED

19  THEM EARLY ON, AND SO I JUST WANTED TO DRAW THAT TO ATTENTION

20  THAT THIS IS ONE AFRICAN AMERICAN JUROR ALSO WHO HAD A

21  CRIMINAL BACKGROUND THAT WAS NOT ASKED BY THE STATE ABOUT IT

22  UNTIL REDIRECT, FAR INTO THE VOIR DIRE.

23            THE COURT: OKAY.   YOU MAY PROCEED.

24  Q     (BY MS. GARCIA) OKAY.   DO YOU RECALL STRIKING A BLACK

25  JUROR YOURSELF?

1  A    THE RECORD REFLECTS THAT I DID, BUT I DO NOT RECALL THE

2  CIRCUMSTANCES OF THAT.

3  Q    OKAY.   AND IF IT GOT TO THE POINT WHERE YOU WERE STRIKING

4  A BLACK JUROR, THAT WOULD NECESSARILY IMPLY THAT THE STATE

5  ACCEPTED A BLACK JUROR?

6  A    WHICH I FOUND HIGHLY -- SITTING HERE TODAY, I FIND VERY

7  ODD, AND MY RECORD OF THE TRIAL WAS DELIVERED TO THE FIRST

8  HABEAS ATTORNEY. BECAUSE I WOULD HAVE LOOKED AT THAT, BECAUSE

9  THAT WAS VERY STRANGE, IN MY OPINION.

10  Q    BUT THAT IS, IN FACT, THE CASE, CORRECT?

11  A    YES.

12  Q    OKAY.   IN YOUR TESTIMONY REGARDING JUROR CELLERS, YOU

13  MENTIONED THAT SHE BROUGHT UP THE FACT OF ALBERTA SOMEWHERE

14  DURING HER VOIR DIRE?

15  A    I BELIEVE I ASKED HER IF SHE WAS RELATED TO ALBERTA

16  CELLERS.

17  Q    YES, THAT WAS YOUR FIRST QUESTION.   YOU STATED: AND I

18  REPRESENT JULIUS, THE YOUNG MAN CHARGED WITH CAPITAL MURDER,

19  AND THIS IS MY CO-COUNSEL.  ARE YOU RELATED TO ALBERTA? AND

20  SHE RESPONDED: UH-HUH.  AND YOU SAID: OKAY, SHE PRACTICALLY

21  RAISED ME.  WHAT DID YOU MEAN BY THAT IF SHE WORKED IN A

22  RESTAURANT?

23  A    ALBERTA HAD BEEN A COOK AT MY FATHER'S RESTAURANT FOR

24  MANY YEARS.  I GREW UP KNOWING ALBERTA.

25  Q    HOW DID SHE RAISE YOU?

1  A    SHE DIDN'T.

2  Q    OKAY.

3              MS. GARCIA: I DON'T HAVE ANYMORE QUESTIONS.

4              THE COURT: ALL RIGHT.  ANYTHING ELSE YOU NEEDED TO

5  ASK MR. HENRY, MR. DUNN?

6              MR. DUNN: NO, YOUR HONOR.

7              THE COURT: ALL RIGHT.  YOU MAY STEP DOWN.  THANK

8  YOU.  ANY OTHER WITNESSES?

9              MR. DUNN: THE PETITIONER IS GOING TO REST.

10             THE COURT: OKAY. DO EITHER OF YOU WISH TO MAKE ANY

11 SORT OF ARGUMENT AT THIS TIME?  YOU DON'T HAVE TO, BUT YOU

12 CERTAINLY ARE WELCOME TO IF YOU SHOULD DESIRE TO.

13             MR. DUNN: YOUR HONOR, I WOULD LIKE TO MAKE AN

14 ARGUMENT.

15             MS. GARCIA: YES, I WOULD LIKE TO, ALSO.

16             THE COURT: ALL RIGHT. THEN WHOEVER WANTS TO GO FIRST

17 MAY.

18             MS. GARCIA: THANK YOU.  I WOULD LIKE TO STRESS THAT

19 DIFFERENT QUESTIONS DOES NOT NECESSARILY EQUATE TO

20 UNCONSTITUTIONALLY DISPARATE QUESTIONING. AND IN THIS CASE

21 THERE IS NO DOUBT THERE WERE DIFFERENT QUESTIONS ASKED TO ALL

22 THE JURORS WITHOUT REGARD TO RACE.  SOME WHITE JURORS WERE

23 ASKED SIMILAR QUESTIONS; SOME BLACK JURORS WERE ASKED SIMILAR

24 QUESTIONS; SOME WHITE AND BLACK JURORS WERE ASKED SIMILAR

25 QUESTIONS.  THERE IS NO PATTERN ESTABLISHED, AND CERTAINLY THE

1 | DEFENDANT HAS NOT MET HIS BURDEN OF ESTABLISHING A PATTERN OF

2 | RACIALLY DISPARATE QUESTIONING, AND CERTAINLY NOT ON THE BASIS

3 | OF CRIMINAL HISTORY OR BACKGROUND.   THAT'S IT.

4 | THE COURT: ALL RIGHT.   THANKS.

5 | MR. DUNN: MAY IT PLEASE THE COURT. YOUR HONOR, I

6 | THINK LITERALLY IT IS A BLACK AND WHITE ISSUE IN THIS CASE.

7 | YOU HAVE OVER A HUNDRED PEOPLE ON A PETIT JURY, SIX OF THEM

8 | ARE BLACK, FIVE OF THEM STRUCK BY THE STATE.  I THINK YOU HAVE

9 | TO LOOK THAT TEN OF THEIR PEREMPTORY STRIKES WERE USED.   THEY

10 | WERE LEFT WITH FIVE.  I THINK THAT'S AN ISSUE WE NEED TO LOOK

11 | AT.  NO BLACKS SERVED ON THE JURY THAT CONVICTED MY CLIENT,

12 | JULIUS MURPHY.  HE IS EIGHTEEN YEARS OLD.  THE VICTIM IN THIS

13 | CASE WAS A TWENTY-SIX YEAR OLD WHITE MAN.  I THINK THAT

14 | FACTORS IN.

15 | THERE WAS DISPARATE QUESTIONING IN THIS CASE.  ALL WE

16 | HAVE TO DO IS LISTEN TO THE TESTIMONY TODAY AND GO BACK AND

17 | REVIEW THE RECORD, SPECIFICALLY DONNA CELLERS AND LADONNA

18 | SMITH.  THEY WERE ASKED TOTALLY DIFFERENT QUESTIONS, AND I

19 | THINK THE REASONS THAT THE PROSECUTOR GAVE WERE NOT REASONS

20 | THAT ARE GOING TO FLY IN THE CASE.  THEY WERE NOT CREDIBLE.  I

21 | DON'T THINK THEY WERE REASONABLE OR RELATED TO TRIAL STRATEGY

22 | AT ALL IN THIS CASE.  I THINK THERE WAS A PLAN BY THE

23 | PROSECUTION IN THIS CASE TO EXCLUDE BLACK JURORS FROM THE CASE

24 | SO THEY COULD SECURE A CONVICTION.

25 | I BELIEVE THAT THE PEREMPTORY CHALLENGE SYSTEM IN THIS

1   CASE WAS BEING PERVERTED BY DENYING BLACKS THE SAME RIGHT AND

2   OPPORTUNITY TO PARTICIPATE IN THE ADMINISTRATION OF JUSTICE

3   ENJOYED BY THE WHITE POPULATION OF THAT COUNTY, AND I THINK

4   THAT THE PROPER REMEDY IN THIS CASE IS A COMPLETE NEW TRIAL

5   FOR THE PETITIONER.   THANK YOU.

6           THE COURT: THANK YOU.   ANYTHING ELSE?   ALL RIGHT.   I

7   APPRECIATE EVERYBODY'S PARTICIPATION AND ATTENDANCE AND

8   PREPARATION TODAY, AND THIS WILL BE VERY HELPFUL IN DRAFTING

9   THE REPORT AND RECOMMENDATION, WHICH I HOPE TO HAVE OUT WITHIN

10   THE NEXT THIRTY DAYS.   SO UNLESS THERE IS ANYTHING ELSE, THEN

11   WE WILL BE ADJOURNED.   THANK YOU.

12         (ADJOURNED AT 2:52 P.M.)

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX

1                                 INDEX

2    WITNESSES FOR

3    RESPONDENT:            DIRECT:    CROSS: REDIRECT:    RECROSS:

4    ALWIN SMITH               5         26        37

5

6    WITNESSES FOR

7    PETITIONER:

8    CRAIG L. HENRY           38         44

9

10   RESPONDENT'S OBJECTION RE: BURDEN OF PROOF: 4

11   PETITIONER'S RESPONSE: 4

12   COURT'S RULING [OR]: 4

13   PETITIONER RESTS:   47

14   RESPONDENT'S CLOSING STATEMENT:   47

15   PETITIONER'S CLOSING STATEMENT:   48

16   THE COURT:   49

17

18

19                    REPORTER'S CERTIFICATION

20       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

21   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

22

23   DATE: _August 13, 2004_              _Libby Crawford_

24                                 LIBBY CRAWFORD, C.S.R.

25                                 OFFICIAL COURT REPORTER